(Slip Opinion) OCTOBER TERM, 2014 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## DEPARTMENT OF TRANSPORTATION ET AL. *v.* ASSOCIATION OF AMERICAN RAILROADS

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 13–1080. Argued December 8, 2014—Decided March 9, 2015

In 1970, Congress created the National Railroad Passenger Corporation (Amtrak). Congress has given Amtrak priority to use track systems owned by the freight railroads for passenger rail travel, at rates agreed to by the parties or, in case of a dispute, set by the Surface Transportation Board. And in 2008, Congress gave Amtrak and the Federal Railroad Administration (FRA) joint authority to issue "metrics and standards" addressing the performance and scheduling of passenger railroad services, see §207(a), 122 Stat. 4907, including Amtrak's on-time performance and train delays caused by host railroads. Respondent, the Association of American Railroads, sued petitioners—the Department of Transportation, the FRA, and two officials—claiming that the metrics and standards must be invalidated because it is unconstitutional for Congress to allow and direct a private entity like Amtrak to exercise joint authority in their issuance. Its argument rested on the Fifth Amendment Due Process Clause and the constitutional provisions regarding separation of powers. The District Court rejected respondent's claims, but the District of Columbia Circuit reversed as to the separation of powers claim, reasoning in central part that Amtrak is a private corporation and thus cannot constitutionally be granted regulatory power under §207.

*Held*: For purposes of determining the validity of the metrics and standards, Amtrak is a governmental entity. Pp. 6–12.

(a) In concluding otherwise, the Court of Appeals relied on the statutory command that Amtrak "is not a department, agency, or instrumentality of the United States Government," 49 U. S. C. §24301(a)(3), and the pronouncement that Amtrak "shall be operated and managed as a for profit corporation," §24301(a)(2). But congres-

sional pronouncements are not dispositive of Amtrak's status as a
governmental entity for purposes of separation of powers analysis
under the Constitution, and an independent inquiry reveals the
Court of Appeals' premise that Amtrak is a private entity was flawed.
As Amtrak's ownership and corporate structure show, the political
branches control most of Amtrak's stock and its Board of Directors,
most of whom are appointed by the President, §24302(a)(1), con-
firmed by the Senate, *ibid.*, and understood by the Executive Branch
to be removable by the President at will.  The political branches also
exercise substantial, statutorily mandated supervision over Amtrak's
priorities and operations.  See, *e.g.,* §24315.  Also of significance,
Amtrak is required by statute to pursue broad public objectives, see,
*e.g.*, §§24101(b), 24307(a); certain aspects of Amtrak's day-to-day op-
erations are mandated by Congress, see, *e.g.*, §§24101(c)(6), 24902(b);
and Amtrak has been dependent on federal financial support during
every year of its existence.  Given the combination of these unique
features and Amtrak's significant ties to the Government, Amtrak is
not an autonomous private enterprise.  Amtrak was created by the
Government, is controlled by the Government, and operates for the
Government's benefit.    Thus, in jointly issuing the metrics and
standards with the FRA, Amtrak acted as a governmental entity for
separation of powers purposes.  And that exercise of governmental
power must be consistent with the Constitution, including those pro-
visions relating to the separation of powers.  Pp. 6–10.

(b) Respondent's reliance on congressional statements about
Amtrak's status is misplaced.  *Lebron* v. *National Railroad Passenger
Corp.*, 513 U. S. 374, teaches that, for purposes of Amtrak's status as
a federal actor or instrumentality under the Constitution, the practi-
cal reality of federal control and supervision prevails over Congress'
disclaimer of Amtrak's governmental status.  Treating Amtrak as
governmental for these purposes, moreover, is not an unbridled grant
of authority to an unaccountable actor, for the political branches cre-
ated Amtrak, control its Board, define its mission, specify many of its
day-to-day operations, have imposed substantial transparency and
accountability mechanisms, and, for all practical purposes, set and
supervise its annual budget.  Pp. 10–11.

(c) The Court of Appeals may address in the first instance any
properly preserved issues respecting the lawfulness of the metrics
and standards that may remain in this case, including questions im-
plicating the Constitution's structural separation of powers and the
Appointments Clause.  Pp. 11–12.

721 F. 3d 666, vacated and remanded.

KENNEDY, J., delivered the opinion of the Court, in which ROBERTS,

Syllabus

C. J., and SCALIA, GINSBURG, BREYER, ALITO, SOTOMAYOR, and KAGAN, JJ., joined. ALITO, J., filed a concurring opinion. THOMAS, J., filed an opinion concurring in the judgment.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

―――――

No. 13–1080

―――――

## DEPARTMENT OF TRANSPORTATION, ET AL., PETITIONERS *v.* ASSOCIATION OF AMERICAN RAILROADS

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[March 9, 2015]

JUSTICE KENNEDY delivered the opinion of the Court.

In 1970, Congress created the National Railroad Passenger Corporation, most often known as Amtrak. Later, Congress granted Amtrak and the Federal Railroad Administration (FRA) joint authority to issue "metrics and standards" that address the performance and scheduling of passenger railroad services. Alleging that the metrics and standards have substantial and adverse effects upon its members' freight services, respondent—the Association of American Railroads—filed this suit to challenge their validity. The defendants below, petitioners here, are the Department of Transportation, the FRA, and two individuals sued in their official capacity.

Respondent alleges the metrics and standards must be invalidated on the ground that Amtrak is a private entity and it was therefore unconstitutional for Congress to allow and direct it to exercise joint authority in their issuance. This argument rests on the Fifth Amendment Due Process Clause and the constitutional provisions regarding separation of powers. The District Court rejected both of re-

spondent's claims. The Court of Appeals for the District of
Columbia Circuit reversed, finding that, for purposes of
this dispute, Amtrak is a private entity and that Congress
violated nondelegation principles in its grant of joint
authority to Amtrak and the FRA. On that premise the
Court of Appeals invalidated the metrics and standards.

Having granted the petition for writ of certiorari, 573
U. S. ___ (2014), this Court now holds that, for purposes of
determining the validity of the metrics and standards,
Amtrak is a governmental entity. Although Amtrak's
actions here were governmental, substantial questions
respecting the lawfulness of the metrics and standards—
including questions implicating the Constitution's struc-
tural separation of powers and the Appointments Clause,
U. S. Const., Art. II, §2, cl. 2—may still remain in the case.
As those matters have not yet been passed upon by the
Court of Appeals, this case is remanded.

## I

## A

Amtrak is a corporation established and authorized by a
detailed federal statute enacted by Congress for no less a
purpose than to preserve passenger services and routes on
our Nation's railroads. See *Lebron* v. *National Railroad
Passenger Corporation*, 513 U. S. 374, 383–384 (1995);
*National Railroad Passenger Corporation* v. *Atchison, T. &
S. F. R. Co.*, 470 U. S. 451, 453–457 (1985); see also Rail
Passenger Service Act of 1970, 84 Stat. 1328. Congress
recognized that Amtrak, of necessity, must rely for most of
its operations on track systems owned by the freight rail-
roads. So, as a condition of relief from their common-
carrier duties, Congress required freight railroads to allow
Amtrak to use their tracks and facilities at rates agreed to
by the parties—or in the event of disagreement to be set
by the Interstate Commerce Commission (ICC). See 45
U. S. C. §§561, 562 (1970 ed.). The Surface Transporta-

tion Board (STB) now occupies the dispute-resolution role originally assigned to the ICC. See 49 U. S. C. §24308(a) (2012 ed.). Since 1973, Amtrak has received a statutory preference over freight transportation in using rail lines, junctions, and crossings. See §24308(c).

The metrics and standards at issue here are the result of a further and more recent enactment. Concerned by poor service, unreliability, and delays resulting from freight traffic congestion, Congress passed the Passenger Rail Investment and Improvement Act (PRIIA) in 2008. See 122 Stat. 4907. Section 207(a) of the PRIIA provides for the creation of the metrics and standards:

> "Within 180 days after the date of enactment of this Act, the Federal Railroad Administration and Amtrak shall jointly, in consultation with the Surface Transportation Board, rail carriers over whose rail lines Amtrak trains operate, States, Amtrak employees, nonprofit employee organizations representing Amtrak employees, and groups representing Amtrak passengers, as appropriate, develop new or improve existing metrics and minimum standards for measuring the performance and service quality of intercity passenger train operations, including cost recovery, on-time performance and minutes of delay, ridership, on-board services, stations, facilities, equipment, and other services." *Id.,* at 4916.

Section 207(d) of the PRIIA further provides:

> "If the development of the metrics and standards is not completed within the 180-day period required by subsection (a), any party involved in the development of those standards may petition the Surface Transportation Board to appoint an arbitrator to assist the parties in resolving their disputes through binding arbitration." *Id.,* at 4917.

The PRIIA specifies that the metrics and standards created under §207(a) are to be used for a variety of purposes. Section 207(b) requires the FRA to "publish a quarterly report on the performance and service quality of intercity passenger train operations" addressing the specific elements to be measured by the metrics and standards. *Id.,* at 4916–4917. Section 207(c) provides that, "[t]o the extent practicable, Amtrak and its host rail carriers shall incorporate the metrics and standards developed under subsection (a) into their access and service agreements." *Id.,* at 4917. And §222(a) obliges Amtrak, within one year after the metrics and standards are established, to "develop and implement a plan to improve on-board service pursuant to the metrics and standards for such service developed under [§207(a)]." *Id.,* at 4932.

Under §213(a) of the PRIIA, the metrics and standards also may play a role in prompting investigations by the STB and in subsequent enforcement actions. For instance, "[i]f the on-time performance of any intercity passenger train averages less than 80 percent for any 2 consecutive calendar quarters," the STB may initiate an investigation "to determine whether and to what extent delays . . . are due to causes that could reasonably be addressed . . . by Amtrak or other intercity passenger rail operators." *Id.,* at 4925–4926. While conducting an investigation under §213(a), the STB "has authority to review the accuracy of the train performance data and the extent to which scheduling and congestion contribute to delays" and shall "obtain information from all parties involved and identify reasonable measures and make recommendations to improve the service, quality, and on-time performance of the train." *Id.,* at 4926. Following an investigation, the STB may award damages if it "determines that delays or failures to achieve minimum standards . . . are attributable to a rail carrier's failure to provide preference to Amtrak over freight transportation." *Ibid.* The STB is further empow-

ered to "order the host rail carrier to remit" damages "to Amtrak or to an entity for which Amtrak operates intercity passenger rail service." *Ibid.*

## B

In March 2009, Amtrak and the FRA published a notice in the Federal Register inviting comments on a draft version of the metrics and standards. App. 75–76. The final version of the metrics and standards was issued jointly by Amtrak and the FRA in May 2010. *Id.,* at 129–144. The metrics and standards address, among other matters, Amtrak's financial performance, its scores on consumer satisfaction surveys, and the percentage of passenger-trips to and from underserved communities.

Of most importance for this case, the metrics and standards also address Amtrak's on-time performance and train delays caused by host railroads. The standards associated with the on-time performance metrics require on-time performance by Amtrak trains at least 80% to 95% of the time for each route, depending on the route and year. *Id.,* at 133–135. With respect to "host-responsible delays"— that is to say, delays attributed to the railroads along which Amtrak trains travel—the metrics and standards provide that "[d]elays must not be more than 900 minutes per 10,000 Train-Miles." *Id.,* at 138. Amtrak conductors determine responsibility for particular delays. *Ibid.,* n. 23.

In the District Court for the District of Columbia, respondent alleged injury to its members from being required to modify their rail operations, which mostly involve freight traffic, to satisfy the metrics and standards. Respondent claimed that §207 "violates the nondelegation doctrine and the separation of powers principle by placing legislative and rulemaking authority in the hands of a private entity [Amtrak] that participates in the very industry it is supposed to regulate." *Id.,* at 176–177, Complaint ¶51. Respondent also asserted that §207 violates

the Fifth Amendment Due Process Clause by "[v]esting the coercive power of the government" in Amtrak, an "interested private part[y]." *Id.,* at 177, ¶¶53–54. In its prayer for relief respondent sought, among other remedies, a declaration of §207's unconstitutionality and invalidation of the metrics and standards. *Id.,* at 177.

The District Court granted summary judgment to petitioners on both claims. See 865 F. Supp. 2d 22 (DC 2012). Without deciding whether Amtrak must be deemed private or governmental, it rejected respondent's nondelegation argument on the ground that the FRA, the STB, and the political branches exercised sufficient control over promulgation and enforcement of the metrics and standards so that §207 is constitutional. See *id.,* at 35.

The Court of Appeals for the District of Columbia Circuit reversed the judgment of the District Court as to the nondelegation and separation of powers claim, reasoning in central part that because "Amtrak is a private corporation with respect to Congress's power to delegate . . . authority," it cannot constitutionally be granted the "regulatory power prescribed in §207." 721 F. 3d 666, 677 (2013). The Court of Appeals did not reach respondent's due process claim. See *ibid.*

## II

In holding that Congress may not delegate to Amtrak the joint authority to issue the metrics and standards—authority it described as "regulatory power," *ibid.*—the Court of Appeals concluded Amtrak is a private entity for purposes of determining its status when considering the constitutionality of its actions in the instant dispute. That court's analysis treated as controlling Congress' statutory command that Amtrak "'is not a department, agency, or instrumentality of the United States Government.'" *Id.,* at 675 (quoting 49 U. S. C. §24301(a)(3)). The Court of Appeals also relied on Congress' pronouncement that

Amtrak "'shall be operated and managed as a for-profit corporation.'" 721 F. 3d, at 675 (quoting §24301(a)(2)); see also *id.,* at 677 ("Though the federal government's involvement in Amtrak is considerable, Congress has both designated it a private corporation and instructed that it be managed so as to maximize profit. In deciding Amtrak's status for purposes of congressional delegations, these declarations are dispositive"). Proceeding from this premise, the Court of Appeals concluded it was impermissible for Congress to "delegate regulatory authority to a private entity." *Id.,* at 670; see also *ibid.* (holding *Carter* v. *Carter Coal Co.*, 298 U. S. 238 (1936), prohibits any such delegation of authority).

That premise, however, was erroneous. Congressional pronouncements, though instructive as to matters within Congress' authority to address, see, *e.g., United States ex rel. Totten* v. *Bombardier Corp.*, 380 F. 3d 488, 491–492 (CADC 2004) (Roberts, J.), are not dispositive of Amtrak's status as a governmental entity for purposes of separation of powers analysis under the Constitution. And an independent inquiry into Amtrak's status under the Constitution reveals the Court of Appeals' premise was flawed.

It is appropriate to begin the analysis with Amtrak's ownership and corporate structure. The Secretary of Transportation holds all of Amtrak's preferred stock and most of its common stock. Amtrak's Board of Directors is composed of nine members, one of whom is the Secretary of Transportation. Seven other Board members are appointed by the President and confirmed by the Senate. 49 U. S. C. §24302(a)(1). These eight Board members, in turn, select Amtrak's president. §24302(a)(1)(B); §24303(a). Amtrak's Board members are subject to salary limits set by Congress, §24303(b); and the Executive Branch has concluded that all appointed Board members are removable by the President without cause, see 27 Op. Atty. Gen. 163 (2003).

Under further statutory provisions, Amtrak's Board members must possess certain qualifications. Congress has directed that the President make appointments based on an individual's prior experience in the transportation industry, §24302(a)(1)(C), and has provided that not more than five of the seven appointed Board members be from the same political party, §24302(a)(3). In selecting Amtrak's Board members, moreover, the President must consult with leaders of both parties in both Houses of Congress in order to "provide adequate and balanced representation of the major geographic regions of the United States served by Amtrak." §24302(a)(2).

In addition to controlling Amtrak's stock and Board of Directors the political branches exercise substantial, statutorily mandated supervision over Amtrak's priorities and operations. Amtrak must submit numerous annual reports to Congress and the President, detailing such information as route-specific ridership and on-time performance. §24315. The Freedom of Information Act applies to Amtrak in any year in which it receives a federal subsidy, 5 U. S. C. §552, which thus far has been every year of its existence. Pursuant to its status under the Inspector General Act of 1978 as a "'designated Federal entity,'" 5 U. S. C. App. §8G(a)(2), p. 521, Amtrak must maintain an inspector general, much like governmental agencies such as the Federal Communications Commission and the Securities and Exchange Commission. Furthermore, Congress conducts frequent oversight hearings into Amtrak's budget, routes, and prices. See, *e.g.,* Hearing on Reviewing Alternatives to Amtrak's Annual Losses in Food and Beverage Service before the Subcommittee on Government Operations of the House Committee on Oversight and Government Reform, 113th Cong., 1st Sess., 5 (2013) (statement of Thomas J. Hall, chief of customer service, Amtrak); Hearing on Amtrak's Fiscal Year 2014 Budget: The Starting Point for Reauthorization before the

Subcommittee on Railroads, Pipelines, and Hazardous Materials of the House Committee on Transportation and Infrastructure, 113th Cong., 1st Sess., p. 6 (2013) (statement of Joseph H. Boardman, president and chief executive officer, Amtrak).

It is significant that, rather than advancing its own private economic interests, Amtrak is required to pursue numerous, additional goals defined by statute. To take a few examples: Amtrak must "provide efficient and effective intercity passenger rail mobility," 49 U. S. C. §24101(b); "minimize Government subsidies," §24101(d); provide reduced fares to the disabled and elderly, §24307(a); and ensure mobility in times of national disaster, §24101(c)(9).

In addition to directing Amtrak to serve these broad public objectives, Congress has mandated certain aspects of Amtrak's day-to-day operations. Amtrak must maintain a route between Louisiana and Florida. §24101(c)(6). When making improvements to the Northeast corridor, Amtrak must apply seven considerations in a specified order of priority. §24902(b). And when Amtrak purchases materials worth more than $1 million, these materials must be mined or produced in the United States, or manufactured substantially from components that are mined, produced, or manufactured in the United States, unless the Secretary of Transportation grants an exemption. §24305(f).

Finally, Amtrak is also dependent on federal financial support. In its first 43 years of operation, Amtrak has received more than $41 billion in federal subsidies. In recent years these subsidies have exceeded $1 billion annually. See Brief for Petitioners 5, and n. 2, 46.

Given the combination of these unique features and its significant ties to the Government, Amtrak is not an autonomous private enterprise. Among other important considerations, its priorities, operations, and decisions are

extensively supervised and substantially funded by the political branches. A majority of its Board is appointed by the President and confirmed by the Senate and is understood by the Executive to be removable by the President at will. Amtrak was created by the Government, is controlled by the Government, and operates for the Government's benefit. Thus, in its joint issuance of the metrics and standards with the FRA, Amtrak acted as a governmental entity for purposes of the Constitution's separation of powers provisions. And that exercise of governmental power must be consistent with the design and requirements of the Constitution, including those provisions relating to the separation of powers.

Respondent urges that Amtrak cannot be deemed a governmental entity in this respect. Like the Court of Appeals, it relies principally on the statutory directives that Amtrak "shall be operated and managed as a for profit corporation" and "is not a department, agency, or instrumentality of the United States Government." §§24301(a)(2)–(3). In light of that statutory language, respondent asserts, Amtrak cannot exercise the joint authority entrusted to it and the FRA by §207(a).

On that point this Court's decision in *Lebron* v. *National Railroad Passenger Corp.*, 513 U. S. 374 (1995), provides necessary instruction. In *Lebron*, Amtrak prohibited an artist from installing a politically controversial display in New York City's Penn Station. The artist sued Amtrak, alleging a violation of his First Amendment rights. In response Amtrak asserted that it was not a governmental entity, explaining that "its charter's disclaimer of agency status prevent[ed] it from being considered a Government entity." *Id.,* at 392. The Court rejected this contention, holding "it is not for Congress to make the final determination of Amtrak's status as a Government entity for purposes of determining the constitutional rights of citizens affected by its actions." *Ibid.* To hold otherwise

would allow the Government "to evade the most solemn obligations imposed in the Constitution by simply resorting to the corporate form." *Id.,* at 397. Noting that Amtrak "is established and organized under federal law for the very purpose of pursuing federal governmental objectives, under the direction and control of federal governmental appointees," *id.,* at 398, and that the Government exerts its control over Amtrak "not as a creditor but as a policymaker," the Court held Amtrak "is an agency or instrumentality of the United States for the purpose of individual rights guaranteed against the Government by the Constitution." *Id.,* at 394, 399.

*Lebron* teaches that, for purposes of Amtrak's status as a federal actor or instrumentality under the Constitution, the practical reality of federal control and supervision prevails over Congress' disclaimer of Amtrak's governmental status. *Lebron* involved a First Amendment question, while in this case the challenge is to Amtrak's joint authority to issue the metrics and standards. But "[t]he structural principles secured by the separation of powers protect the individual as well." *Bond* v. *United States*, 564 U. S. ___, ___ (2011) (slip op., at 10). Treating Amtrak as governmental for these purposes, moreover, is not an unbridled grant of authority to an unaccountable actor. The political branches created Amtrak, control its Board, define its mission, specify many of its day-to-day operations, have imposed substantial transparency and accountability mechanisms, and, for all practical purposes, set and supervise its annual budget. Accordingly, the Court holds that Amtrak is a governmental entity, not a private one, for purposes of determining the constitutional issues presented in this case.

## III

Because the Court of Appeals' decision was based on the flawed premise that Amtrak should be treated as a private

entity, that opinion is now vacated. On remand, the Court of Appeals, after identifying the issues that are properly preserved and before it, will then have the instruction of the analysis set forth here. Respondent argues that the selection of Amtrak's president, who is appointed "not by the President . . . but by the other eight Board Members," "call[s] into question Amtrak's structure under the Appointments Clause," Brief for Respondent 42; that §207(d)'s arbitrator provision "is a plain violation of the nondelegation principle" and the Appointments Clause requiring invalidation of §207(a), *id.,* at 26; and that Congress violated the Due Process Clause by "giv[ing] a federally chartered, nominally private, for-profit corporation regulatory authority over its own industry," *id.,* at 43. Petitioners, in turn, contend that "the metrics and standards do not reflect the exercise of 'rulemaking' authority or permit Amtrak to 'regulate other private entities,'" and thus do not raise nondelegation concerns. Reply Brief 5 (internal citation omitted). Because "[o]urs is a court of final review and not first view," *Zivotofsky* v. *Clinton*, 566 U. S. ___, ___ (2012) (slip op., at 12) (internal quotation marks omitted), those issues—to the extent they are properly before the Court of Appeals—should be addressed in the first instance on remand.

The judgment of the Court of Appeals for the District of Columbia Circuit is vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

No. 13–1080

DEPARTMENT OF TRANSPORTATION, ET AL., PETITIONERS *v.* ASSOCIATION OF AMERICAN RAILROADS

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[March 9, 2015]

JUSTICE ALITO, concurring.

I entirely agree with the Court that Amtrak is "a federal actor or instrumentality," as far as the Constitution is concerned. *Ante*, at 11. "Amtrak was created by the Government, is controlled by the Government, and operates for the Government's benefit." *Ante,* at 10. The Government even "specif[ies] many of its day-to-day operations" and "for all practical purposes, set[s] and supervise[s] its annual budget." *Ante,* at 11. The District of Columbia Circuit understandably heeded 49 U. S. C. §24301(a)(3), which proclaims that Amtrak "is *not* a department, agency, or instrumentality of the United States Government," but this statutory label cannot control for constitutional purposes. (Emphasis added). I therefore join the Court's opinion in full. I write separately to discuss what follows from our judgment.

I

This case, on its face, may seem to involve technical issues, but in discussing trains, tracks, metrics, and standards, a vital constitutional principle must not be forgotten: Liberty requires accountability.

When citizens cannot readily identify the source of legislation or regulation that affects their lives, Govern-

ment officials can wield power without owning up to the consequences.  One way the Government can regulate without accountability is by passing off a Government operation as an independent private concern.  Given this incentive to regulate without saying so, everyone should pay close attention when Congress "sponsor[s] corporations that it specifically designate[s] *not* to be agencies or establishments of the United States Government." *Lebron* v. *National Railroad Passenger Corporation*, 513 U. S. 374, 390 (1995).

Recognition that Amtrak is part of the Federal Government raises a host of constitutional questions.

## II

I begin with something that may seem mundane on its face but that has a significant relationship to the principle of accountability.  Under the Constitution, all officers of the United States must take an oath or affirmation to support the Constitution and must receive a commission. See Art. VI, cl. 3 ("[A]ll executive and judicial Officers . . . shall be bound by Oath or Affirmation, to support this Constitution"); Art. II, §3, cl. 6 (The President "shall Commission all the Officers of the United States").  There is good reason to think that those who have not sworn an oath cannot exercise significant authority of the United States.  See 14 Op. Atty. Gen. 406, 408 (1874) ("[A] Representative . . . does not become a member of the House until he takes the oath of office"); 15 Op. Atty. Gen. 280, 281 (1877) (similar).*  And this Court certainly has never treated a commission from the President as a mere wall ornament.  See, *e.g., Marbury* v. *Madison*, 1 Cranch 137, 156 (1803); see also *id.,* at 179 (noting the importance of an oath).

————————

* It is noteworthy that the first statute enacted by Congress was "An Act to regulate the Time and Manner of administering certain Oaths." Act of June 1, 1789, ch. 1, §1, 1 Stat. 23.

Both the Oath and Commission Clauses confirm an important point: Those who exercise the power of Government are set apart from ordinary citizens. Because they exercise greater power, they are subject to special restraints. There should never be a question whether someone is an officer of the United States because, to be an officer, the person should have sworn an oath and possess a commission.

Here, respondent tells the Court that "Amtrak's board members do not take an oath of office to uphold the Constitution, as do Article II officers vested with rulemaking authority." Brief for Respondent 47. The Government says not a word in response. Perhaps there is an answer. The rule, however, is clear. Because Amtrak is the Government, *ante,* at 11, those who run it need to satisfy basic constitutional requirements.

## III

I turn next to the Passenger Rail Investment and Improvement Act of 2008's (PRIIA) arbitration provision. 122 Stat. 4907. Section 207(a) of the PRIIA provides that "the Federal Railroad Administration [(FRA)] and Amtrak shall jointly . . . develop new or improve existing metrics and minimum standards for measuring the performance and service quality of intercity passenger train operations." *Id.,* at 4916. In addition, §207(c) commands that "[t]o the extent practicable, Amtrak and its host rail carriers shall incorporate [those] metrics and standards . . . into their access and service agreements." Under §213(a) of the PRIIA, moreover, "the metrics and standards also may play a role in prompting investigations by the [Surface Transportation Board (STB)] and in subsequent enforcement actions." *Ante*, at 4.

This scheme is obviously regulatory. Section 207 provides that Amtrak and the FRA "shall jointly" create new standards, cf. *e.g.,* 12 U. S. C. §1831m(g)(4)(B) ("The ap-

propriate Federal banking agencies shall jointly issue
rules of practice to implement this paragraph"), and that
Amtrak and *private rail carriers* "shall incorporate" those
standards into their agreements whenever "practicable,"
cf. *e.g., BP America Production Co.* v. *Burton*, 549 U. S. 84,
88 (2006) (characterizing a command to "'audit and recon-
cile, to the extent practicable, all current and past lease
accounts'" as creating "duties" for the Secretary of the
Interior (quoting 30 U. S. C. §1711(c)(1))). The fact that
private rail carriers sometimes may be required by federal
law to include the metrics and standards in their contracts
by itself makes this a regulatory scheme.

"As is often the case in administrative law," moreover,
"the metrics and standards lend definite regulatory force
to an otherwise broad statutory mandate." 721 F. 3d 666,
672 (CADC 2013). Here, though the nexus between regu-
lation, statutory mandate, and penalty is not direct (for, as
the Government explains, there is a pre-existing require-
ment that railroads give preference to Amtrak, see Brief
for Petitioners 31–32 (citing 49 U. S. C. §§24308(c), (f)),
the metrics and standards inherently have a "coercive
effect," *Bennett* v. *Spear*, 520 U. S. 154, 169 (1997), on
private conduct. Even the United States concedes, with
understatement, that there is "perhaps some incentivizing
effect associated with the metrics and standards." Brief
for Petitioners 30. Because obedience to the metrics and
standards materially reduces the risk of liability, railroads
face powerful incentives to obey. See *Bennett*, *supra,* at
169–171. That is regulatory power.

The language from §207 quoted thus far should raise
red flags. In one statute, Congress says Amtrak is not an
"agency." 49 U. S. C. §24301(a)(3). But then Congress
commands Amtrak to act like an agency, with effects on
private rail carriers. No wonder the D. C. Circuit ruled as
it did.

The oddity continues, however. Section 207(d) of the

PRIIA also provides that if the FRA and Amtrak cannot agree about what the regulatory standards should say, then "any party involved in the development of those standards may petition the Surface Transportation Board to appoint an arbitrator to assist the parties in resolving their disputes through binding arbitration." 122 Stat. 4917. The statute says nothing more about this "binding arbitration," including who the arbitrator should be.

Looking to Congress' use of the word "arbitrator," respondent argues that because the arbitrator can be a private person, this provision by itself violates the private nondelegation doctrine. The United States, for its part, urges the Court to read the term "arbitrator" to mean "public arbitrator" in the interests of constitutional avoidance.

No one disputes, however, that the arbitration provision is fair game for challenge, even though no arbitration occurred. The obvious purpose of the arbitration provision was to force Amtrak and the FRA to compromise, or else a third party would make the decision for them. The D. C. Circuit is correct that when Congress enacts a compromise-forcing mechanism, it is no good to say that the mechanism cannot be challenged because the parties compromised. See 721 F. 3d, at 674. "[S]tack[ing] the deck in favor of compromise" was the whole point. *Ibid.* Unsurprisingly, this Court has upheld standing to bring a separation-of-powers challenge in comparable circumstances. See *Metropolitan Washington Airports Authority* v. *Citizens for Abatement of Aircraft Noise, Inc.*, 501 U. S. 252, 264–265 (1991) ("[T]his 'personal injury' to respondents is 'fairly traceable' to the Board of Review's veto power *because knowledge that the master plan was subject to the veto power undoubtedly influenced MWAA's Board of Directors*" (emphasis added)); see also *Free Enterprise Fund* v. *Public Company Accounting Oversight Bd.*, 561 U. S. 477, 512, n. 12 (2010) ("We cannot assume . . . that

the Chairman would have made the same appointments acting alone").

As to the merits of this arbitration provision, I agree with the parties: If the arbitrator can be a private person, this law is unconstitutional. Even the United States accepts that Congress "cannot delegate regulatory authority to a private entity." 721 F. 3d, at 670. Indeed, Congress, vested with enumerated "legislative Powers," Art. I, §1, cannot delegate its "exclusively legislative" authority at all. *Wayman* v. *Southard*, 10 Wheat. 1, 42–43 (1825) (Marshall, C. J.). The Court has invalidated statutes for that very reason. See *A. L. A. Schechter Poultry Corp.* v. *United States*, 295 U. S. 495 (1935); *Panama Refining Co.* v. *Ryan*, 293 U. S. 388 (1935); see also *Mistretta* v. *United States*, 488 U. S. 361, 373, n. 7 (1989) (citing, *inter alia*, *Industrial Union Dept., AFL–CIO* v. *American Petroleum Institute*, 448 U. S. 607, 646 (1980)).

The principle that Congress cannot delegate away its vested powers exists to protect liberty. Our Constitution, by careful design, prescribes a process for making law, and within that process there are many accountability checkpoints. See *INS* v. *Chadha*, 462 U. S. 919, 959 (1983). It would dash the whole scheme if Congress could give its power away to an entity that is not constrained by those checkpoints. The Constitution's deliberative process was viewed by the Framers as a valuable feature, see, *e.g.,* Manning, Lawmaking Made Easy, 10 Green Bag 2d 202 (2007) ("[B]icameralism and presentment make lawmaking difficult *by design*" (citing, *inter alia*, The Federalist No. 62, p. 378 (J. Madison), and No. 63, at 443–444 (A. Hamilton))), not something to be lamented and evaded.

Of course, this Court has "'almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law.'" *Whitman* v. *American Trucking Assns., Inc.*, 531 U. S. 457, 474–475 (2001) (quoting *Mis-*

*tretta*, *supra,* at 416 (SCALIA, J., dissenting)). But the inherent difficulty of line-drawing is no excuse for not enforcing the Constitution. Rather, the formal reason why the Court does not enforce the nondelegation doctrine with more vigilance is that the other branches of Government have vested powers of their own that can be used in ways that resemble lawmaking. See, *e.g., Arlington* v. *FCC*, 569 U. S. ___, ___–___, n. 4 (2013) (slip op., at 13–14, n. 4) (explaining that agency rulemakings "are exercises of— indeed, under our constitutional structure they *must be* exercises of—the 'executive Power'" (quoting Art. II, §1, cl. 1)). Even so, "the citizen confronting thousands of pages of regulations—promulgated by an agency directed by Congress to regulate, say, 'in the public interest'—can perhaps be excused for thinking that it is the agency really doing the legislating." 569 U. S*.,* at ___–___ (ROBERTS, C. J., dissenting) (slip op., at 4–5).

When it comes to private entities, however, there is not even a fig leaf of constitutional justification. Private entities are not vested with "legislative Powers." Art. I, §1. Nor are they vested with the "executive Power," Art. II, §1, cl. 1, which belongs to the President. Indeed, it raises "[d]ifficult and fundamental questions" about "the delegation of Executive power" when Congress authorizes citizen suits. *Friends of the Earth, Inc.* v. *Laidlaw Environmental Services (TOC), Inc.*, 528 U. S. 167, 197 (2000) (KENNEDY, J., concurring). A citizen suit to enforce existing law, however, is nothing compared to delegated power to create new law. By any measure, handing off regulatory power to a private entity is "legislative delegation in its most obnoxious form." *Carter* v. *Carter Coal Co.*, 298 U. S. 238, 311 (1936).

For these reasons, it is hard to imagine how delegating "binding" tie-breaking authority to a private arbitrator to resolve a dispute between Amtrak and the FRA could be constitutional. No private arbitrator can promulgate

binding metrics and standards for the railroad industry.
Thus, if the term "arbitrator" refers to a private arbitrator,
or even the *possibility* of a private arbitrator, the Consti-
tution is violated. See 721 F. 3d, at 674 ("[T]hat the recip-
ients of illicitly delegated authority opted not to make use
of it is no antidote. It is *Congress's* decision to delegate
that is unconstitutional" (citing *Whitman, supra,* at 473)).

As I read the Government's briefing, it does not dispute
any of this (other than my characterization of the PRIIA
as regulatory, which it surely is). Rather than trying to
defend a private arbitrator, the Government argues that
the Court, for reasons of constitutional avoidance, should
read the word "arbitrator" to mean "public arbitrator."
The Government's argument, however, lurches into a new
problem: Constitutional avoidance works only if the stat-
ute is susceptible to an alternative reading and that such
an alternative reading would itself be constitutional.

Here, the Government's argument that the word "arbi-
trator" does not mean "private arbitrator" is in some ten-
sion with the ordinary meaning of the word. Although
Government arbitrators are not unheard of, we usually
think of arbitration as a form of "private dispute resolu-
tion." See, *e.g., Stolt-Nielsen S. A.* v. *AnimalFeeds Int'l
Corp.*, 559 U. S. 662, 685 (2010).

Likewise, the appointment of a public arbitrator here
would raise serious questions under the Appointments
Clause. Unless an "inferior Office[r]" is at issue, Article II
of the Constitution demands that the President appoint all
"Officers of the United States" with the Senate's advice
and consent. Art. II, §2, cl. 2. This provision ensures that
those who exercise the power of the United States are
accountable to the President, who himself is accountable
to the people. See *Free Enterprise Fund*, 561 U. S., at
497–498 (citing The Federalist No. 72, p. 487 (J. Cooke ed.
1961) (A. Hamilton)). The Court has held that someone
"who exercis[es] significant authority pursuant to the laws

of the United States" is an "Officer," *Buckley* v. *Valeo*, 424 U. S. 1, 126 (1976) (*per curiam*), and further that an officer who acts without supervision must be a principal officer, see *Edmond* v. *United States*, 520 U. S. 651, 663 (1997) ("[W]e think it evident that 'inferior officers' are officers whose work is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate"). While some officers may be principal even if they have a supervisor, it is common ground that an officer without a supervisor must be principal. See *id.,* at 667 (Souter, J., concurring in part and concurring in judgment).

Here, even under the Government's public-arbitrator theory, it looks like the arbitrator would be making law without supervision—again, it is "binding arbitration." Nothing suggests that those words mean anything other than what they say. This means that an arbitrator could set the metrics and standards that "shall" become part of a private railroad's contracts with Amtrak whenever "practicable." As to that "binding" decision, who is the supervisor? Inferior officers can do many things, but nothing final should appear in the Federal Register unless a Presidential appointee has at least signed off on it. See 75 Fed. Reg. 26839 (2010) (placing the metrics and standards in the Federal Register); *Edmond, supra,* at 665.

IV

Finally, the Board of Amtrak, and, in particular, Amtrak's president, also poses difficult constitutional problems. As the Court observes, "Amtrak's Board of Directors is composed of nine members, one of whom is the Secretary of Transportation. Seven other Board members are appointed by the President and confirmed by the Senate. These eight Board members, in turn, select Amtrak's president." *Ante,* at 7 (citation omitted). In other words, unlike everyone else on the Board, Amtrak's

president has not been appointed by the President and confirmed by the Senate.

As explained above, accountability demands that principal officers be appointed by the President. See Art. II, §2, cl. 2. The President, after all, must have "the general administrative control of those executing the laws," *Myers* v. *United States*, 272 U. S. 52, 164 (1926), and this principle applies with special force to those who can "exercis[e] significant authority" without direct supervision, *Buckley*, *supra,* at 126; see also *Edmond*, *supra*, at 663. Unsurprisingly then, the United States defends the non-Presidential appointment of Amtrak's president on the ground that the Amtrak president is merely an inferior officer. Given Article II, for the Government to argue anything else would be surrender.

This argument, however, is problematic. Granted, a multimember body may head an agency. See *Free Enterprise Fund*, *supra,* at 512–513. But those who head agencies must be principal officers. See *Edmond*, *supra*, at 663. It would seem to follow that because agency heads must be principal officers, every member of a multimember body heading an agency must also be a principal officer. After all, every member of a multimember body could cast the deciding vote with respect to a particular decision. One would think that anyone who has the unilateral authority to tip a final decision one way or the other cannot be an inferior officer.

The Government's response is tucked away in a footnote. It contends that because Amtrak's president serves at the pleasure of the other Board members, he is only an inferior officer. See Reply Brief for Petitioners 14, n. 6. But the Government does not argue that the president of Amtrak cannot cast tie-breaking votes. Assuming he can vote when the Board of Directors is divided, it makes no sense to think that the side with which the president *agrees* will demand his removal.

In any event, even assuming that Amtrak's president could be an inferior officer, there would still be another problem: Amtrak's Board may lack constitutional authority to appoint inferior officers. The Appointments Clause provides an exception from the ordinary rule of Presidential appointment for "inferior Officers," but that exception has accountability limits of its own, namely, that Congress may only vest the appointment power "in the President alone, in the Courts of Law, or in the Heads of Departments." Art. II, §2, cl. 2. Although a multimember body like Amtrak's Board *can* head a Department, here it is not at all clear that Amtrak *is* a Department.

A "Department" may not be "subordinate to or contained within any other such component" of the Executive Branch. *Free Enterprise Fund*, 561 U. S., at 511. As explained above, however, in jointly creating metrics and standards, Amtrak may have to give way to an arbitrator appointed by the STB. Does that mean that Amtrak is "subordinate to" the STB? See also 49 U. S. C. §24308 (explaining the STB's role in disputes between Amtrak and rail carriers). At the same time, the Secretary of Transportation sits on Amtrak's Board and controls some aspects of Amtrak's relationship with rail carriers. See, *e.g.,* §§24302(a)(1), 24309(d)(2). The Secretary of Transportation also has authority to exempt Amtrak from certain statutory requirements. See §24305(f)(4). Does that mean that Amtrak is "subordinate to or contained within" the Department of Transportation? (The STB, of course, also may be "subordinate to or contained within" the Department of Transportation. If so, this may further suggest that that Amtrak is not a Department, and also further undermine the STB's ability to appoint an arbitrator). All of these are difficult questions.

\* \* \*

In sum, while I entirely agree with the Court that

Amtrak must be regarded as a federal actor for constitutional purposes, it does not by any means necessarily follow that the present structure of Amtrak is consistent with the Constitution.  The constitutional issues that I have outlined (and perhaps others) all flow from the fact that no matter what Congress may call Amtrak, the Constitution cannot be disregarded.

# SUPREME COURT OF THE UNITED STATES

_____

No. 13–1080

_____

## DEPARTMENT OF TRANSPORTATION, ET AL., PETITIONERS *v.* ASSOCIATION OF AMERICAN RAILROADS

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[March 9, 2015]

JUSTICE THOMAS, concurring in the judgment.

We have come to a strange place in our separation-of-powers jurisprudence. Confronted with a statute that authorizes a putatively private market participant to work hand-in-hand with an executive agency to craft rules that have the force and effect of law, our primary question—indeed, the primary question the parties ask us to answer—is whether that market participant is subject to an adequate measure of control by the Federal Government. We never even glance at the Constitution to see what it says about how this authority must be exercised and by whom.

I agree with the Court that the proper disposition in this case is to vacate the decision below and to remand for further consideration of respondent's constitutional challenge to the metrics and standards. I cannot join the majority's analysis, however, because it fails to fully correct the errors that require us to vacate the Court of Appeals' decision. I write separately to describe the framework that I believe should guide our resolution of delegation challenges and to highlight serious constitutional defects in the Passenger Rail Investment and Improvement Act of 2008 (PRIIA) that are properly presented for the lower courts' review on remand.

I

The Constitution does not vest the Federal Government with an undifferentiated "governmental power."  Instead, the Constitution identifies three types of governmental power and, in the Vesting Clauses, commits them to three branches of Government.  Those Clauses provide that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States," Art. I, §1, "[t]he executive Power shall be vested in a President of the United States," Art. II, §1, cl. 1, and "[t]he judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish," Art. III, §1.

These grants are exclusive.  See *Whitman* v. *American Trucking Assns., Inc.*, 531 U. S. 457, 472 (2001) (legislative power); *Free Enterprise Fund* v. *Public Company Accounting Oversight Bd.*, 561 U. S. 477, 496–497 (2010) (executive power); *Stern* v. *Marshall*, 564 U. S. ___, ___–___ (2011) (slip op., at 16–17) (judicial power).  When the Government is called upon to perform a function that requires an exercise of legislative, executive, or judicial power, only the vested recipient of that power can perform it.

In addition to allocating power among the different branches, the Constitution identifies certain restrictions on the *manner* in which those powers are to be exercised. Article I requires, among other things, that "[e]very Bill which shall have passed the House of Representatives and the Senate, shall, before it become a Law, be presented to the President of the United States; If he approve he shall sign it, but if not he shall return it . . . ."  Art. I, §7, cl. 2. And although the Constitution is less specific about how the President shall exercise power, it is clear that he may carry out his duty to take care that the laws be faithfully executed with the aid of subordinates.  *Myers* v. *United States*, 272 U. S. 52, 117 (1926), overruled in part on unre-

lated grounds in *Humphrey's Executor* v. *United States*, 295 U. S. 602 (1935).

When the Court speaks of Congress improperly delegating power, what it means is Congress' authorizing an entity to exercise power in a manner inconsistent with the Constitution. For example, Congress improperly "delegates" legislative power when it authorizes an entity other than itself to make a determination that requires an exercise of legislative power. See *Whitman, supra*, at 472. It also improperly "delegates" legislative power to itself when it authorizes itself to act without bicameralism and presentment. See, *e.g., INS* v. *Chadha*, 462 U. S. 919 (1983). And Congress improperly "delegates"—or, more precisely, authorizes the exercise of, see *Perez* v. *Mortgage Bankers Assn.*, *post*, at 22 (THOMAS, J., concurring in judgment) (noting that Congress may not "delegate" power it does not possess)—executive power when it authorizes individuals or groups outside of the President's control to perform a function that requires the exercise of that power. See, *e.g., Free Enterprise Fund*, *supra.*

In order to be able to adhere to the provisions of the Constitution that allocate and constrain the exercise of these powers, we must first understand their boundaries. Here, I do not purport to offer a comprehensive description of these powers. My purpose is to identify principles relevant to today's dispute, with an eye to offering guidance to the lower courts on remand. At issue in this case is the proper division between legislative and executive powers. An examination of the history of those powers reveals how far our modern separation-of-powers jurisprudence has departed from the original meaning of the Constitution.

## II

The allocation of powers in the Constitution is absolute, *Perez*, *post,* at 5–8 (opinion of THOMAS, J.), but it does not

follow that there is no overlap between the three categories of governmental power. Certain functions may be performed by two or more branches without either exceeding its enumerated powers under the Constitution. Resolution of claims against the Government is the classic example. At least when Congress waives its sovereign immunity, such claims may be heard by an Article III court, which adjudicates such claims by an exercise of judicial power. See *Ex parte Bakelite Corp.*, 279 U. S. 438, 452 (1929). But Congress may also provide for an executive agency to adjudicate such claims by an exercise of executive power. See *ibid.* Or Congress may resolve the claims itself, legislating by special Act. See *ibid.* The question is whether the particular function requires the exercise of a certain type of power; if it does, then only the branch in which that power is vested can perform it. For example, although this Court has long recognized that it does not necessarily violate the Constitution for Congress to authorize another branch to make a determination that it could make itself, there are certain core functions that require the exercise of legislative power and that only Congress can perform. *Wayman* v. *Southard*, 10 Wheat. 1, 43 (1825) (distinguishing between those functions Congress must perform itself and those it may leave to another branch).

The function at issue here is the formulation of generally applicable rules of private conduct. Under the original understanding of the Constitution, that function requires the exercise of legislative power. By corollary, the discretion inherent in executive power does *not* comprehend the discretion to formulate generally applicable rules of private conduct.

## A

The idea that the Executive may not formulate generally applicable rules of private conduct emerged even before

the theory of the separation of powers on which our Constitution was founded.

The idea has ancient roots in the concept of the "rule of law," which has been understood since Greek and Roman times to mean that a ruler must be subject to the law in exercising his power and may not govern by will alone. M. Vile, Constitutionalism and the Separation of Powers 25 (2d ed. 1998); 2 Bracton, De Legibus et Consuetudinibus Angliae 33 (G. Woodbine ed., S. Thorne transl. 1968). The principle that a ruler must govern according to law "presupposes at least two distinct operations, the making of law, and putting it into effect." Vile, *supra,* at 24. Although it was originally thought "that the rule of law was satisfied if a king made good laws and always acted according to them," it became increasingly apparent over time that the rule of law demanded that the operations of "making" law and of "putting it into effect" be kept separate. W. Gwyn, The Meaning of the Separation of Powers 35 (1965); see also *id.,* at 8–9. But when the King's power was at its height, it was still accepted that his "principal duty . . . [was], to govern *his people* according to *law*." 1 W. Blackstone, Commentaries on the Laws of England 226 (1765) (Commentaries) (emphasis added).

An early expression of this idea in England is seen in the "constitutional" law concerning crown proclamations. Even before a more formal separation of powers came about during the English Civil War, it was generally thought that the King could not use his proclamation power to alter the rights and duties of his subjects. P. Hamburger, Is Administrative Law Unlawful? 33–34 (2014) (Hamburger). This power could be exercised by the King only in conjunction with Parliament and was exercised through statutes. *Ibid.*; see also M. Hale, The Prerogatives of the King 141, 171–172 (D. Yale ed. 1976). The King might participate in "the legislative power" by giving his "assent" to laws created by the "concurrence" of "lords

and commons assembled in parliament," but he could not
of his own accord "make a law or impose a charge." *Id.,* at
at 141.

In 1539, King Henry VIII secured what might be called
a "delegation" of the legislative power by prevailing on
Parliament to pass the Act of Proclamations. Hamburger
35–36. That Act declared that the King's proclamations
would have the force and effect of an Act of Parliament.
*Id.,* at 37. But the Act did not permit the King to deprive
his subjects of their property, privileges and franchises, or
their lives, except as provided by statutory or common law.
*Id.,* at 37–38. Nor did the Act permit him to invalidate
"'any acts, [or] common laws standing at [that] time in
strength and force.'" *Id.,* at 38 (quoting An Act that Proc-
lamations Made by the King Shall be Obeyed, 31 Hen.
VIII, ch. 8, in Eng. Stat. at Large 263 (1539)).

Even this limited delegation of lawmaking power to the
King was repudiated by Parliament less than a decade
later. Hamburger 38. Reflecting on this period in history,
David Hume would observe that, when Parliament "gave
to the king's proclamation the same force as to a statute
enacted by parliament," it "made by one act a total sub-
version of the English constitution." 3 D. Hume, The
History of England from the Invasion of Julius Ceasar to
the Revolution in 1688, p. 266 (1983). By the 17th century,
when English scholars and jurists began to articulate a
more formal theory of the separation of powers, delega-
tions of the type afforded to King Henry VIII were all but
unheard of. Hale, *supra,* at 172–173.

This is not to say that the Crown did not endeavor to
exercise the power to make rules governing private con-
duct. King James I made a famous attempt, see *Perez*,
*post,* at 14 (opinion of THOMAS, J.), prompting the influen-
tial jurist Chief Justice Edward Coke to write that the
King could not "change any part of the common law, nor
create any offence by his proclamation, which was not an

offence before, without Parliament." *Case of Proclamations*, 12 Co. Rep. 74, 75, 77 Eng. Rep. 1352, 1353 (K. B. 1611). Coke associated this principle with Chapter 39 of the Magna Carta,[1] which he understood to guarantee that no subject would be deprived of a private right—that is, a right of life, liberty, or property—except in accordance with "the law of the land," which consisted only of statutory and common law. Chapman & McConnell, Due Process as Separation of Powers, 121 Yale L. J. 1672, 1688 (2012). When the King attempted to fashion rules of private conduct unilaterally, as he did in the *Case of Proclamations*, the resulting enforcement action could not be said to accord with "the law of the land."

John Locke echoed this view. "[F]reedom of men under government," he wrote, "is to have a standing rule to live by, common to every one of that society, and made by the *legislative power* erected in it . . . and not to be subject to the inconstant, uncertain, unknown, arbitrary will of another man." J. Locke, Second Treatise of Civil Government §22, p. 13 (J. Gough ed. 1947) (Locke) (emphasis added). It followed that this freedom required that the power to make the standing rules and the power to enforce them not lie in the same hands. See *id.*, §143, at 72. He further concluded that "[t]he legislative c[ould not] transfer the power of making laws to any other hands: for it being but a delegated power from the people, they who have it [could not] pass it over to others." *Id.*, §141, at 71.[2]

––––––––––

[1] Chapter 39 of the 1215 Magna Carta declared that "[n]o free man shall be taken, imprisoned, disseised, outlawed, banished, or in any way destroyed, nor will We proceed against or prosecute him, except by the lawful judgment of his peers and by the law of the land." A. Howard, Magna Carta: Text and Commentary 43 (1964).

[2] Locke and his contemporaries also believed that requiring laws to be made in Parliament secured the common interest. W. Gwyn, The Meaning of the Separation of Powers 75 (1965). Parliament would assemble to do the business of legislation, but then its members would disperse to live as private citizens under the laws they had created,

William Blackstone, in his Commentaries, likewise maintained that the English Constitution required that no subject be deprived of core private rights except in accordance with the law of the land. See 1 Commentaries 129, 134, 137–138. He defined a "law" as a generally applicable "rule of civil conduct prescribed by the supreme power in a state, commanding what is right and prohibiting what is wrong." *Id.,* at 44 (internal quotation marks omitted). And he defined a tyrannical government as one in which "the right both of *making* and of *enforcing* the laws, is vested in one and the same man, or one and the same body of men," for "wherever these two powers are united together, there can be no public liberty." *Id.,* at 142. Thus, although Blackstone viewed Parliament as sovereign and capable of changing the constitution, *id.,* at 156, he thought a delegation of lawmaking power to be "disgrace[ful]," 4 *id.,* at 424; see also Hamburger 39, n. 17.

## B

These principles about the relationship between private rights and governmental power profoundly influenced the men who crafted, debated, and ratified the Constitution. The document itself and the writings surrounding it reflect a conviction that the power to make the law and the power to enforce it must be kept separate, particularly with respect to the regulation of private conduct.

The Framers' dedication to the separation of powers has been well-documented, if only half-heartedly honored.

---

providing them an incentive to legislate in the common interest. During Parliament's absence, the King might meet certain emergencies through the exercise of prerogative power, but in order to make new, permanent laws, he would be required to call Parliament into session. Locke §§143–144, at 72–73. If the King were not dependent on Parliament to legislate, then this beneficial cycle of periodic lawmaking interspersed with representatives' living as private citizens would be broken.

See, *e.g., Mistretta* v. *United States*, 488 U. S. 361, 380–381 (1989). Most famously, in The Federalist 47, Madison wrote that "[n]o political truth is certainly of greater intrinsic value, or is stamped with the authority of more enlightened patrons of liberty than" the separation of powers. The Federalist No. 47, p. 301 (C. Rossiter ed. 1961). "The accumulation of all powers, legislative, executive, and judiciary, in the same hands, . . . may justly be pronounced the very definition of tyranny." *Ibid.*; see also *Perez*, *post,* at 7–8 (opinion of THOMAS, J.).

This devotion to the separation of powers is, in part, what supports our enduring conviction that the Vesting Clauses are exclusive and that the branch in which a power is vested may not give it up or otherwise reallocate it. The Framers were concerned not just with the starting allocation, but with the "gradual concentration of the several powers in the same department." The Federalist No. 51, at 321 (J. Madison). It was this fear that prompted the Framers to build checks and balances into our constitutional structure, so that the branches could defend their powers on an ongoing basis. *Ibid.*; see also *Perez*, *post,* at 7 (opinion of THOMAS, J.).

In this sense, the founding generation did not subscribe to Blackstone's view of parliamentary supremacy. Parliament's violations of the law of the land had been a significant complaint of the American Revolution, Chapman & McConnell, *supra,* at 1699–1703. And experiments in legislative supremacy in the States had confirmed the idea that even the legislature must be made subject to the law. *Perez*, *post,* at 6–7 (opinion of THOMAS, J.). James Wilson explained the Constitution's break with the legislative supremacy model at the Pennsylvania ratification convention:

> "Sir William Blackstone will tell you, that in Britain . . . the Parliament may alter the form of the govern-

ment; and that its power is absolute, without control.
The idea of a constitution, limiting and superintend-
ing the operations of legislative authority, seems not
to have been accurately understood in Britain. . . .

   "To control the power and conduct of the legislature,
by an overruling constitution, was an improvement in
the science and practice of government reserved to the
American states."  2 J. Elliot, Debates on the Federal
Constitution 432 (2d ed. 1863); see also 4 *id.,* at 63
(A. Maclaine) (contrasting Congress, which "is to be
guided by the Constitution" and "cannot travel beyond
its bounds," with the Parliament described in Black-
stone's Commentaries).

As an illustration of Blackstone's contrasting model of
sovereignty, Wilson cited the Act of Proclamations, by
which Parliament had delegated legislative power to King
Henry VIII.  2 *id.,* at 432 (J. Wilson); see *supra,* at 6.

   At the center of the Framers' dedication to the separa-
tion of powers was individual liberty.  The Federalist No.
47, at 302 (J. Madison) (quoting Baron de Montesquieu for
the proposition that "'[t]here can be no liberty where the
legislative and executive powers are united in the same
person, or body of magistrates'").  This was not liberty in
the sense of freedom from all constraint, but liberty as
described by Locke: "to have a standing rule to live by . . .
made by the *legislative power*," and to be free from "the
inconstant, uncertain, unknown, arbitrary will of another
man."  Locke §22, at 13.  At the heart of this liberty were
the Lockean private rights: life, liberty, and property.  If a
person could be deprived of these private rights on the
basis of a rule (or a will) not enacted by the legislature,
then he was not truly free.  See D. Currie, The Constitu-
tion in the Supreme Court: The First One Hundred Years,

1789–1888, p. 272, and n. 268 (1985).[3]

This history confirms that the core of the legislative power that the Framers sought to protect from consolidation with the executive is the power to make "law" in the Blackstonian sense of generally applicable rules of private conduct.

### III

Even with these sound historical principles in mind, classifying governmental power is an elusive venture. *Wayman*, 10 Wheat., at 43; The Federalist No. 37, at 228 (J. Madison). But it is no less important for its difficulty. The "check" the judiciary provides to maintain our separation of powers is enforcement of the rule of law through judicial review. *Perez, post,* at 14 (opinion of THOMAS, J.). We may not—without imperiling the delicate balance of our constitutional system—forgo our judicial duty to ascertain the meaning of the Vesting Clauses and to adhere to that meaning as the law. *Perez, post,* at 14–16.

We have been willing to check the improper allocation of executive power, see, *e.g., Free Enterprise Fund*, 561 U. S. 477; *Metropolitan Washington Airports Authority* v. *Citizens for Abatement of Aircraft Noise, Inc.*, 501 U. S. 252 (1991), although probably not as often as we should, see, *e.g., Morrison* v. *Olson*, 487 U. S. 654 (1988). Our record with regard to legislative power has been far worse.

We have held that the Constitution categorically forbids Congress to delegate its legislative power to any other body, *Whitman,* 531 U. S., at 472, but it has become in-

---

[3] I do not mean to suggest here that the Framers believed an Act of the Legislature was *sufficient* to deprive a person of private rights; only that it was necessary. See generally Chapman & McConnell, Due Process as Separation of Powers, 121 Yale L. J. 1672, 1715, 1721–1726 (2012) (discussing historical evidence that the Framers believed the Due Process Clause limited Congress' power to provide by law for the deprivation of private rights without judicial process).

creasingly clear to me that the test we have applied to
distinguish legislative from executive power largely abdicates our duty to enforce that prohibition. Implicitly
recognizing that the power to fashion legally binding rules
is legislative, we have nevertheless classified rulemaking
as executive (or judicial) power when the authorizing
statute sets out "an intelligible principle" to guide the
rulemaker's discretion. *Ibid.* Although the Court may
never have intended the boundless standard the "intelligible principle" test has become, it is evident that it does not
adequately reinforce the Constitution's allocation of legislative power. I would return to the original understanding
of the federal legislative power and require that the Federal Government create generally applicable rules of
private conduct only through the constitutionally prescribed legislative process.

A

The Court first announced the intelligible principle test
in *J. W. Hampton, Jr., & Co.* v. *United States*, 276 U. S.
394 (1928). That case involved a challenge to a tariff
assessed on a shipment of barium dioxide. *Id.,* at 400.
The rate of the tariff had been set by proclamation of the
President, pursuant to the so-called flexible tariff provision of the Tariff Act of 1922. *Ibid.* That provision authorized the President to increase or decrease a duty set by the
statute if he determined that the duty did not "'equalize
. . . differences in costs of production [of the item to which
the duty applied] in the United States and the principal
competing country.'" *Id.,* at 401 (quoting 19 U. S. C. §154
(1925 ed.)). The importer of the barium dioxide challenged
the provision as an unconstitutional delegation of legislative power to the President. 276 U. S., at 404. Agreeing
that Congress could not delegate legislative power, the
Court nevertheless upheld the Act as constitutional, setting forth the now-famous formulation: "If Congress shall

lay down by legislative act an intelligible principle to which the person or body authorized to fix such rates is directed to conform, such legislative action is not a forbidden delegation of legislative power." *Id.*, at 409.

Though worded broadly, the test rested on a narrow foundation. At the time *J. W. Hampton* was decided, most "delegations" by Congress to the Executive, including the delegation at issue in that case, had taken the form of conditional legislation. See *Marshall Field & Co.* v. *Clark*, 143 U. S. 649, 683–689 (1892). That form of legislation "makes the suspension of certain provisions and the going into operation of other provisions of an Act of Congress depend upon the action of the President based upon the occurrence of subsequent events, or the ascertainment by him of certain facts, to be made known by his proclamation." *Id.*, at 683.

The practice of conditional legislation dates back at least to the Third Congress in 1794. *Id.*, at 683–689 (collecting statutes). It first came before the Court in *Cargo of Brig Aurora* v. *United States*, 7 Cranch 382 (1813). There, the Court considered whether a Presidential proclamation could, by declaring that France had ceased to violate the neutral commerce of the United States, reinstate a legislative Act embargoing British goods. *Id.,* at 384, 388. The Court concluded that the proclamation was effective, seeing "no sufficient reaso[n] why the legislature should not exercise its discretion . . . either expressly or conditionally, as their judgment should direct." *Id.,* at 388.

At least as defined by the Court in *Field*, the practice of conditional legislation does not seem to call on the President to exercise a core function that demands an exercise of legislative power. Congress creates the rule of private conduct, and the President makes the *factual* determination that causes that rule to go into effect. That type of factual determination seems similar to the type of factual determination on which an enforcement action is condi-

tioned: Neither involves an exercise of policy discretion, and both are subject to review by a court. See *Union Bridge Co.* v. *United States*, 204 U. S. 364, 386 (1907) (explaining that, when the Secretary of War determined whether bridges unreasonably obstruct navigation, he "could not be said to exercise strictly legislative . . . power any more, for instance, than it could be said that Executive officers exercise such power when, upon investigation, they ascertain whether a particular applicant for a pension belongs to a class of persons who, under general rules prescribed by Congress, are entitled to pensions").

As it happens, however, conditional statutes sometimes did call for the President to make at least an implicit policy determination. For example, a 1794 provision entitled "An Act to authorize the President of the United States to lay, regulate and revoke Embargoes," ch. 41, 1 Stat. 372, called on the President to impose an embargo on shipping "whenever, in his opinion, the public safety shall so require . . . ." *Ibid.* The statutes at issue in *Field* and *J. W. Hampton* could similarly be viewed as calling for built-in policy judgments. See Schoenbrod, The Delegation Doctrine: Could The Court Give It Substance? 83 Mich. L. Rev. 1223, 1263–1264 (1985).[4]  Such delegations

---

[4]The statute at issue in *Field* authorized the President to reimpose statutory duties on exports from a particular country if he found that the country had imposed "reciprocally unequal and unreasonable" duties on U. S. exports. 143 U. S., at 692. At least insofar as the terms "unequal" and "unreasonable" did not have settled common-law definitions that could be applied mechanically to the facts, they could be said to call for the President to exercise policy judgment about which duties qualified. See *id.,* at 699 (Lamar, J., dissenting but concurring in judgment) (The statute "does not, as was provided in the statutes of 1809 and 1810, entrust the President with the ascertainment of a fact therein defined upon which the law is to go into operation. It goes farther than that, and deputes to the President the power to suspend another section in the same act whenever 'he may deem' the action of any foreign nation . . . to be 'reciprocally unequal and unreasona-

of policy determinations pose a constitutional problem because they effectively permit the President to define some or all of the content of that rule of conduct. He may do so expressly—by setting out regulations specifying what conduct jeopardizes "the public safety," for example—or implicitly—by drawing distinctions on an ad hoc basis. In either event, he does so based on a policy judgment that is not reviewable by the courts, at least to the extent that the judgment falls within the range of discretion permitted him by the law. See *id.,* at 1255–1260.

The existence of these statutes should not be taken to suggest that the Constitution, as originally understood, would permit such delegations. The 1794 embargo statute involved the external relations of the United States, so the determination it authorized the President to make arguably did not involve an exercise of core legislative power. See *id.,* at 1260–1263 (distinguishing the tariff statute at issue in *Field* and *J. W. Hampton* on these grounds).[5]

———————

ble. . . ’”). Similarly, the statute at issue in *J. W. Hampton* called on the President, with the aid of a commission, to determine the "'costs of production'" for various goods—a calculation that could entail an exercise of policy judgment about the appropriate wage and profit rates in the relevant industries. 276 U. S., at 401.

[5] The definition of "law" in England at the time of the ratification did not necessarily include rules—even rules of private conduct—dealing with external relations. For example, while "every Englishman [could] claim a right to abide in his own country so long as he pleases; and not to be driven from it unless by the sentence of the law," the King "by his royal prerogative, [could] issue out his writ *ne exeat regnum*, and prohibit any of his subjects from going into foreign parts without licence." 1 Commentaries 133. It is thus likely the Constitution grants the President a greater measure of discretion in the realm of foreign relations, and the conditional tariff Acts must be understood accordingly. See *Clinton* v. *City of New York*, 524 U. S. 417, 445 (1998) (distinguishing *Field* on the ground that the statute at issue in *Field* regulated foreign trade); see also *United States* v. *Curtiss-Wright Export Corp.*, 299 U. S. 304, 324 (1936) ("Practically every volume of the United States Statutes contains one or more acts or joint resolutions of Congress authorizing action by the President in respect of subjects affecting

Moreover, the statute was never subjected to constitutional scrutiny. And when a statute of its kind—that is, a tariff statute calling for an exercise of policy judgment— finally came before this Court for consideration in *Field*, the Court appeared to understand the statute as calling for no more than a *factual* determination. 143 U. S., at 693. The Court thus did not in that case endorse the principle that the Executive may fashion generally applicable rules of private conduct and appears not to have done so until the 20th century.

More to the point, *J. W. Hampton* can be read to adhere to the "factual determination" rationale from *Field*. The Court concluded its delegation analysis in *J. W. Hampton not* with the "intelligible principle" language, but by citing to *Field* for the proposition that the "Act did not in any real sense invest the President with the power of legislation, *because nothing involving the expediency or just operation* of such legislation was left to the determination of the President." 276 U. S., at 410 (emphasis added); *Field*, 143 U. S., at 692 (explaining that an Act did not "in any real sense, invest the President with the power of legislation"). Congress had created a "named contingency," and the President "was the mere agent of the law-making department to ascertain and declare the event upon which its expressed will was to take effect." *J. W. Hampton, supra,* at 410–411.[6]

—————

foreign relations, which either leave the exercise of the power to his unrestricted judgment, or provide a standard far more general than that which has always been considered requisite with regard to domestic affairs"). This Court has at least once expressly relied on this rationale to sanction a delegation of power to make rules governing private conduct in the area of foreign trade. See *Buttfield* v. *Stranahan*, 192 U. S. 470, 496 (1904).

[6] Contemporary perceptions of the statute were less sanguine. One editorial deemed it "the most dangerous advance in bureaucratic government ever attempted in America." D. Schoenbrod, Power Without Responsibility 36 (1993) (quoting Letter from J. Cotton (Feb. 7,

The analysis in *Field* and *J. W. Hampton* may have been premised on an incorrect assessment of the statutes before the Court, see n. 4, *supra*, but neither purported to define executive power as including the discretion to make generally applicable rules governing private conduct. To the extent that our modern jurisprudence treats them as sanctioning the "delegation" of such power, it misunderstands their historical foundations and expands the Court's holdings.

## B

It is nevertheless true that, at the time *J. W. Hampton* was decided, there was a growing trend of cases upholding statutes pursuant to which the Executive exercised the power of "making . . . subordinate rules within prescribed limits." *Panama Refining Co.* v. *Ryan*, 293 U. S. 388, 421 (1935); see also *id.,* at 429 (collecting cases). These cases involved executive power to make "binding rules of conduct," and they were found valid "as subordinate rules . . . [when] within the framework of the policy which the legislature ha[d] sufficiently defined." *Id.,* at 428–429. To the extent that these cases endorsed authorizing the Executive to craft generally applicable rules of private conduct, they departed from the precedents on which they purported to rely.

The key decision to which these cases purport to trace their origin is *Wayman*, 10 Wheat. 1, but that decision does not stand for the proposition those cases suggest. Although it upheld a statute authorizing courts to set

_____

1929), in With Our Readers, 13 Constitutional Review 98, 101 (1929)). President-elect Hoover stirred the public with promises of a repeal: "There is only one commission to which delegation of [the] authority [to set tariffs] can be made. That is the great commission of [the people's] own choosing, the Congress of the United States and the President." Public Papers of the Presidents, Herbert Hoover, 1929, p. 565 (1974); see also Schoenbrod, *supra,* at 36.

rules governing the execution of their own judgments, *id.,* at 50, its reasoning strongly suggests that rules of private conduct were not the proper subject of rulemaking by the courts. Writing for the Court, Chief Justice Marshall surveyed a number of choices that could be left to rule-making by the courts, explaining that they concerned only "the regulation of the conduct of the officer of the Court in giving effect to its judgments." *Id.,* at 45. When it came to specifying "the mode of obeying the mandate of a writ," however, he lamented that "so much of that which may be done by the judiciary, under the authority of the legisla-ture, seems to be blended with that for which the legisla-ture must expressly and directly provide." *Id.,* at 46.

This important passage reflects two premises that Chief Justice Marshall took for granted, but which are disre-garded in later decisions relying on this precedent: First, reflected in his discussion of "blending" permissible with impermissible discretion, is the premise that it is not the *quantity*, but the *quality*, of the discretion that determines whether an authorization is constitutional. Second, re-flected in the contrast Chief Justice Marshall draws be-tween the two types of rules, is the premise that the rules "for which the legislature must expressly and directly provide" are those regulating private conduct rather than those regulating the conduct of court officers.

Thus, when Chief Justice Marshall spoke about the "difficulty in discerning the exact limits within which the legislature may avail itself of the agency of its Courts," *ibid.*, he did not refer to the difficulty in discerning whether the Legislature's policy guidance is "sufficiently de-fined," see *Panama Refining, supra,* at 429, but instead the difficulty in discerning which rules affected substan-tive private rights and duties and which did not. We continue to wrestle with this same distinction today in our decisions distinguishing between substantive and proce-dural rules both in diversity cases and under the Rules

Enabling Act. See, *e.g., Shady Grove Orthopedic Associates, P. A.* v. *Allstate Ins. Co.*, 559 U. S. 393, 406–407 (2010) ("In the Rules Enabling Act, Congress authorized this Court to promulgate rules of procedure subject to its review, 28 U. S. C. §2072(a), but with the limitation that those rules 'shall not abridge, enlarge or modify any substantive right,' §2072(b)").[7]

## C

Today, the Court has abandoned all pretense of enforcing a qualitative distinction between legislative and executive power. To the extent that the "intelligible principle" test was ever an adequate means of enforcing that distinction, it has been decoupled from the historical understanding of the legislative and executive powers and thus does not keep executive "lawmaking" within the bounds of inherent executive discretion. See *Whitman*, 531 U. S.*,* at 487 (THOMAS, J., concurring) ("I am not convinced that the intelligible principle doctrine serves to prevent all cessions of legislative power"). Perhaps we were led astray by the optical illusion caused by different branches carrying out the same functions, believing that the separation of powers would be substantially honored so long as the encroachment were not too great. See, *e.g., Loving* v. *United States*, 517 U. S. 748, 773 (1996) ("Separation-of-powers principles are vindicated, not disserved, by measured

———————

[7] Another early precedent on which the errant "subordinate rulemaking" line of cases relies involves rules governing mining claims on public land. *Jackson* v. *Roby*, 109 U. S. 440, 441 (1883); see also *United States* v. *Grimaud*, 220 U. S. 506 (1911) (sustaining an Act authorizing the Secretary of Agriculture to make rules and regulations governing the use and occupancy of public forest reservations). Although perhaps questionable on its own terms, *Jackson* is distinguishable because it did not involve the Government's reaching out to regulate private conduct, but instead involved the Government's setting rules by which individuals might enter onto public land to avail themselves of resources belonging to the Government.

cooperation between two political branches of the Gov-
ernment, each contributing to a lawful objective through
its own processes"). Or perhaps we deliberately departed
from the separation, bowing to the exigencies of modern
Government that were so often cited in cases upholding
challenged delegations of rulemaking authority.[8] See, *e.g.,
Mistretta*, 488 U. S., at 372 ("[O]ur jurisprudence has been
driven by a practical understanding that in our increas-
ingly complex society, replete with ever changing and
more technical problems, Congress simply cannot do its
job absent an ability to delegate power under broad gen-
eral directives").

For whatever reason, the intelligible principle test now
requires nothing more than a minimal degree of specificity
in the instructions Congress gives to the Executive when it
authorizes the Executive to make rules having the force
and effect of law. And because the Court has "'almost
never felt qualified to second-guess Congress regarding
the permissible degree of policy judgment that can be left
to those executing or applying the law,'" *Whitman*, *supra*,
at 474–475 (majority opinion) (quoting *Mistretta*, *supra,* at
416 (SCALIA, J., dissenting)), the level of specificity it has
required has been very minimal indeed, see 531 U. S., at
474 (collecting cases upholding delegations to regulate in
the "public interest"). Under the guise of the intelligible-
principle test, the Court has allowed the Executive to go
beyond the safe realm of factual investigation to make
political judgments about what is "unfair" or "unneces-
sary." See, *e.g., American Power & Light Co.* v. *SEC*, 329
U. S. 90, 104–105 (1946). It has permitted the Executive
to make trade-offs between competing policy goals. See,

---

[8] Much of the upheaval in our delegation jurisprudence occurred dur-
ing the Progressive Era, a time marked by an increased faith in the
technical expertise of agencies and a commensurate cynicism about
principles of popular sovereignty. See *Perez* v. *Mortgage Bankers Assn.*,
*post,* at 19–20, n. 6 (THOMAS, J., concurring in judgment).

*e.g., Yakus* v. *United States*, 321 U. S. 414, 420, 423–426 (1944) (approving authorization for agency to set prices of commodities at levels that "will effectuate the [sometimes conflicting] purposes of th[e] Act"); see also *Industrial Union Dept., AFL–CIO* v. *American Petroleum Institute*, 448 U. S. 607, 686–687 (1980) (Rehnquist, J., concurring in judgment) ("It is difficult to imagine a more obvious example of Congress simply avoiding a choice which was both fundamental for purposes of the statute and yet politically so divisive that the necessary decision or compromise was difficult, if not impossible, to hammer out in the legislative forge"). It has even permitted the Executive to decide which policy goals it wants to pursue. *Entergy Corp.* v. *Riverkeeper, Inc.*, 556 U. S. 208, 218–223 (2009) (concluding that Congress gave the Environmental Protection Agency (EPA) discretion to decide whether it should consider costs in making certain rules). And it has given sanction to the Executive to craft significant rules of private conduct. See, *e.g., Whitman*, 531 U. S., at 472–476 (approving delegation to EPA to set national standards for air quality); see also *id.,* at 488–489 (Stevens, J., concurring in part and concurring in judgment) (arguing that the Clean Air Act effects a delegation of legislative power because it authorizes EPA to make prospective, generally applicable rules of conduct).

Our reluctance to second-guess Congress on the *degree* of policy judgment is understandable; our mistake lies in assuming that *any* degree of policy judgment is permissible when it comes to establishing generally applicable rules governing private conduct. To understand the "intelligible principle" test as permitting Congress to delegate policy judgment in this context is to divorce that test from its history. It may never be possible perfectly to distinguish between legislative and executive power, but that does not mean we may look the other way when the Government asks us to apply a legally binding rule that is not

enacted by Congress pursuant to Article I.

We should return to the original meaning of the Constitution: The Government may create generally applicable rules of private conduct only through the proper exercise of legislative power. I accept that this would inhibit the Government from acting with the speed and efficiency Congress has sometimes found desirable. In anticipating that result and accepting it, I am in good company. John Locke, for example, acknowledged that a legislative body "is usually too numerous, and so too slow for the dispatch requisite to execution." Locke §160, at 80. But he saw that as a benefit for legislation, for he believed that the creation of rules of private conduct should be an irregular and infrequent occurrence. See *id.,* §143, at 72. The Framers, it appears, were inclined to agree. As Alexander Hamilton explained in another context, "It may perhaps be said that the power of preventing bad laws includes that of preventing good ones . . . . But this objection will have little weight with those who can properly estimate the mischiefs of that inconstancy and mutability in the laws, which form the greatest blemish in the character and genius of our governments." The Federalist No. 73, at 443–444. I am comfortable joining his conclusion that "[t]he injury which may possibly be done by defeating a few good laws will be amply compensated by the advantage of preventing a number of bad ones." *Id.*, at 444.

## IV

Although the majority corrects an undoubted error in the framing of the delegation dispute below, it does so without placing that error in the context of the constitutional provisions that govern respondent's challenge to §207 of the PRIIA.

## A

Until the case arrived in this Court, the parties pro-

ceeded on the assumption that Amtrak is a private entity, albeit one subject to an unusual degree of governmental control.[9] The Court of Appeals agreed. 721 F. 3d 666, 674–677 (CADC 2013). Because it also concluded that Congress delegated regulatory power to Amtrak, *id.,* at 670–674, and because this Court has held that delegations of regulatory power to private parties are impermissible, *Carter* v. *Carter Coal Co.*, 298 U. S. 238, 311 (1936), it held the delegation to be unconstitutional, 721 F. 3d, at 677.

Although no provision of the Constitution expressly forbids the exercise of governmental power by a private entity, our so-called "private nondelegation doctrine" flows logically from the three Vesting Clauses. Because a private entity is neither Congress, nor the President or one of his agents, nor the Supreme Court or an inferior court established by Congress, the Vesting Clauses would categorically preclude it from exercising the legislative, executive, or judicial powers of the Federal Government. In short, the "private nondelegation doctrine" is merely one application of the provisions of the Constitution that forbid Congress to allocate power to an ineligible entity, whether governmental or private.

For this reason, a conclusion that Amtrak is private—that is, not part of the Government at all—would necessarily mean that it cannot exercise these three categories of governmental power. But the converse is not true: A determination that Amtrak acts as a governmental entity in crafting the metrics and standards says nothing about whether it properly exercises governmental power when it does so. An entity that "was created by the Government,

———————————

[9] See Brief for Appellees in No. 12–5204 (DC), pp. 23–29 (defending §207 under cases upholding statutes "assign[ing] an important role to a private party"); *id.,* at 29 ("Amtrak . . . is not a private entity comparable to the [private parties in a relevant precedent]. Although the government does not control Amtrak's day-to-day operations, the government exercises significant structural control").

is controlled by the Government, and operates for the Government's benefit," *ante,* at 10 (majority opinion), but that is not properly constituted to exercise a power under one of the Vesting Clauses, is no better qualified to be a delegatee of that power than is a purely private one.  To its credit, the majority does not hold otherwise.  It merely refutes the Court of Appeals' premise that Amtrak is private.  But this answer could be read to suggest, wrongly, that our conclusion about Amtrak's status has some constitutional significance for "delegation" purposes.

### B

The first step in the Court of Appeals' analysis on remand should be to classify the power that §207 purports to authorize Amtrak to exercise.  The second step should be to determine whether the Constitution's requirements for the exercise of that power have been satisfied.

### 1

Under the original understanding of the legislative and executive power, Amtrak's role in the creation of metrics and standards requires an exercise of legislative power because it allows Amtrak to decide the applicability of standards that provide content to generally applicable rules of private conduct.

Specifically, the metrics and standards alter the railroads' common-carrier obligations under 49 U. S. C. §11101.  Host railroads may enter into contracts with Amtrak under §§10908 and 24308 to fulfill their common-carrier obligations.  The metrics and standards shape the types of contracts that satisfy the common-carrier obligations because §207 provides that "Amtrak and its host rail carriers *shall*" include the metrics and standards in their contracts "[t]o the extent practicable."  PRIIA §207(c), 49 U.S.C. §24101 (note) (emphasis added).  As JUSTICE ALITO explains, it matters little that the railroads may avoid

incorporating the metrics and standards by arguing that incorporation is impracticable; the point is that they have a legal duty to try—a duty the substance of which is defined by the metrics and standards. See *ante*, at 3–4 (concurring opinion). And that duty is backed up by the Surface Transportation Board's coercive power to impose "reasonable terms" on host railroads when they fail to come to an agreement with Amtrak. §24308(a)(2)(A)(ii). Presumably, when it is "practicable" to incorporate the metrics and standards, the Board is better positioned to deem such terms "reasonable" and to force them upon the railroads.

Although the Government's argument to the contrary will presumably change now that the Court has held that Amtrak is a governmental entity, it argued before this Court that Amtrak did not exercise meaningful power because other "governmental entities had sufficient control over the development and adoption of the metrics and standards." Brief for Petitioners 19–26. For support, the Government relied on two questionable precedents in which this Court held that Congress may grant private actors the power to determine whether a government regulation will go into effect: *Currin* v. *Wallace*, 306 U. S. 1 (1939), and *United States* v. *Rock Royal Co-operative, Inc.*, 307 U. S. 533 (1939). Those precedents reason that it does not require an exercise of legislative power to decide whether and when legally binding rules of private conduct will go into effect. *Currin, supra,* at 16–18; *Rock Royal, supra,* at 574–577. But as I have explained above, to the extent that this decision involves an exercise of policy discretion, it requires an exercise of legislative power. *Supra,* at 21–22. In any event, these precedents are directly contrary to our more recent holding that a discretionary "veto" necessarily involves an exercise of legislative power. See *INS* v. *Chadha*, 462 U. S., at 952–953; see also *id.,* at 987 (White, J., dissenting) (noting that the

power Congress reserved to itself was virtually identical to the power it conferred on private parties in *Currin* and *Rock Royal*). As such, *Currin* and *Rock Royal* have been discredited and lack any force as precedents.

Section 207 therefore violates the Constitution. Article I, §1, vests the legislative power in Congress, and Amtrak is not Congress. The procedures that §207 sets forth for enacting the metrics and standards also do not comply with bicameralism and presentment. Art. I, §7. For these reasons, the metrics and standards promulgated under this provision are invalid.

2

I recognize, of course, that the courts below will be bound to apply our "intelligible principle" test. I recognize, too, that that test means so little that the courts are likely to conclude that §207 calls for nothing more than the exercise of executive power. Having made that determination, the Court of Appeals must then determine whether Amtrak is constitutionally eligible to exercise executive power.

As noted, Article II of the Constitution vests the executive power in a "President of the United States of America." Art. II, §1. Amtrak, of course, is not the President of the United States, but this fact does not immediately disqualify it from the exercise of executive power. Congress may authorize subordinates of the President to exercise such power, so long as they remain subject to Presidential control.

The critical question, then, is whether Amtrak is adequately subject to Presidential control. See *Myers*, 272 U. S., at 117. Our precedents treat appointment and removal powers as the primary devices of executive control, *Free Enterprise Fund*, 561 U. S., at 492, and that should be the starting point of the Court of Appeals' analysis. As JUSTICE ALITO's concurrence demonstrates,

however, there are other constitutional requirements that the Court of Appeals should also scrutinize in deciding whether Amtrak is constitutionally eligible to exercise the power §207 confers on it.

\*    \*    \*

In this case, Congress has permitted a corporation subject only to limited control by the President to create legally binding rules. These rules give content to private railroads' statutory duty to share their private infrastructure with Amtrak. This arrangement raises serious constitutional questions to which the majority's holding that Amtrak is a governmental entity is all but a non sequitur. These concerns merit close consideration by the courts below and by this Court if the case reaches us again. We have too long abrogated our duty to enforce the separation of powers required by our Constitution. We have overseen and sanctioned the growth of an administrative system that concentrates the power to make laws and the power to enforce them in the hands of a vast and unaccountable administrative apparatus that finds no comfortable home in our constitutional structure. The end result may be trains that run on time (although I doubt it), but the cost is to our Constitution and the individual liberty it protects.